# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| SHELBOURNE NORTH WATER STREET, L.P. | ) Case No. 13-44315 (JSB) |
| Debtor. | ) Honorable Janet S. Baer |
| GARRETT KELLEHER | ) |
| Plaintiff, | ) |
| v. | ) Adversary Proceeding No. |
| NATIONAL ASSET LOAN MANAGEMENT, LTD. AND CAPITA ASSET SERVICES (IRELAND) LIMITED, | ) |
| Defendants. | ) |

## COMPLAINT FOR DECLARATORY JUDGMENT AND DAMAGES

Garrett Kelleher ("Kelleher") by his attorneys, hereby seeks (a) a declaratory judgment against National Asset Loan Management Ltd. ("NALM") and Capita Asset Services (Ireland) Limited ("Capita" and, collectively, with NALM, the "Defendants"), finding that the claims being asserted by the Defendants were released and enjoined in connection with the chapter 11 bankruptcy case of Shelbourne North Water Street, L.P. ("Shelbourne"); and (b) an award of damages in favor of Kelleher and against the Defendants, as follows:

## PARTIES

1. Kelleher is resident of Chicago, Illinois and is the former principal of Shelbourne.

2. Shelbourne was formed as a Delaware limited partnership with its principal place of business in Chicago, Illinois.

{GARRETT/001/00042810.DOC/6}

3. NALM is an Irish entity formed by the government of Ireland under Ireland's National Asset Management Agency Act in order to liquidate certain real estate holdings in Europe and the United States and loans owned by Anglo Irish Bank Ltd. and other entities that were rendered insolvent. NALM's principal place of business is Treasury Building, Dublin, Co. Dublin, Ireland.

4. NALM is owned by National Asset Management Group Services, Ltd., an Irish entity, which is wholly owned by National Asset Management Ltd., an Irish entity, which is wholly owned by National Asset Management Agency Investment Ltd., an Irish entity, which is owned by National Asset Management Agency (Ireland) ("NAMA") (49%) and certain undisclosed private investors that collectively own 51%.

5. In August, 2013, National Asset Property Management, Ltd., an affiliate of NALM that is also owned by National Asset Management Group, Services, Ltd., formed National Asset Sarasota LLC ("NAS"), a Florida limited liability corporation for the purpose of acquiring and holding real property located in the United States.

6. Capita is an Irish corporation with its principal place of business at Block C, Maynooth Business Campus, Maynooth, Co. Kildare, Ireland. Capita operates as a service provider on behalf of and in accordance with the instructions of the National Asset Management Agency, Ireland ("NAMA") and has attempted to collect certain amounts from Kelleher at his residence in Chicago, Illinois that the Defendants allege are due to NALM.

**JURISDICTION AND VENUE**

7. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the express terms of the Confirmation Order (as defined below).

8. Venue is proper in this District pursuant to 28 U.S.C. § 1409(a).

## **FACTS**

9.  In 2006, Shelbourne acquired undeveloped real property with the address 400 East North Water Street, Chicago, Illinois (the "Property"), and began planning development of an architecturally-significant skyscraper known as the "Chicago Spire" on the Property.

The Original Loan Transaction

10.  To facilitate Shelbourne's purchase of the Property in 2006, Shelbourne obtained a loan (the "Loan") from Anglo Irish Bank Corporation Limited, formerly known as Anglo Irish Bank Corporation plc ("Anglo Irish"). The terms and conditions of the Loan were set forth in a facility letter (as amended, the "Facility Letter"), dated as of July 18, 2006, by and among Shelbourne as borrower and Anglo Irish as lender, by which Shelbourne initially borrowed the aggregate principal amount of $54,500,000 from Anglo Irish.

11.  The Facility Letter was later amended by a First Amendment to Facility Letter dated as of January 1, 2008, and subsequently by a Second Amendment to Facility Letter dated as of September 11, 2008, and then by a Third Amendment to Facility Letter dated as of April 27, 2009.

12.  The Loan advanced by the Facility Letter was evidenced by a Promissory Note (the "Original Note") dated July 20, 2006. Subsequently, the Original Note was amended by a First Amendment to Promissory Note dated January 1, 2008.

13.  On or about September 11, 2008, Anglo Irish advanced to Shelbourne an additional sum of $15,000,000. At that time, Shelbourne executed and delivered to Anglo Irish an Amended and Restated Promissory Note (the "A&R Note") dated September 11, 2008, in the principal sum of $69,500,000.

The Subsequent Loan Facilities

14.  On or about December 29, 2008, Anglo Irish entered into an additional loan facility with Kelleher, providing a loan in the maximum amount of $5,643,850 (the "December 29 Facility").

A true and correct copy of the facility letter (the "December 29 Facility Letter") is attached hereto as **Exhibit A**.

15. As set forth in the December 29 Facility Letter, the purpose of the facility was "[t]o fund ongoing operations at the 'Spire' project through March 31, 2009 as per the attached cashflow." In connection with the December 29 Facility Letter, Kelleher executed a Certificate for the Purposes of the Consumer Credit Act, 1995 and the European Communities (Unfair Terms in Consumer Contracts) Regulations, 1995, a copy of which is attached hereto as **Exhibit B**. Therein, he stated "[t]he Facility is to be advanced to assist the Borrower as stated under clause 2 of the Facility Letter," and "None of the provisions of the European Communities (Unfair Terms in Consumer Contracts) Regulations, 1995 (the 'Regulations') apply to the Facility as I am not acting for purposes which are outside my business and I am not therefore a 'consumer' within the meaning of the Regulations."

16. The funds provided pursuant to the December 29 Facility Letter were paid directly to third party vendors in satisfaction of amounts due for goods and services provided to Shelbourne in connection with ongoing operations of the Chicago Spire development.

17. No portion of the funds provided pursuant to the December 29 Facility Letter was paid directly to Kelleher or to his personal creditors.

18. On information and belief, the December 28 Facility listed Kelleher as a borrower in order to permit Anglo Irish to obtain a security interest in Mr. Kelleher's membership in Milltown, LLC and so as not to be subordinate to liens on Shelbourne's Property by making a loan to Shelbourne.

19. Subsequently, Shelbourne executed and delivered to Anglo Irish a First Amendment to the A&R Note (the "A&R Note First Amendment," and together with the A&R Note, the "Note") dated as of April 27, 2009.

20. On that same date, Anglo Irish extended the December 29 Facility with Kelleher, increasing the maximum loan amount to $6,151,000 (the "April 27 Facility"). A true and correct copy of the facility letter (the "April 27 Facility Letter") is attached hereto as **Exhibit C**.

21. As set forth in the April 27 Facility Letter, the purpose of the April 27 Facility was "[t]o fund ongoing operations at the 'Spire' project and interest roll up through October 2, 2009."

22. The additional funds provided pursuant to the April 27 Facility Letter were paid directly to third party vendors in satisfaction of amounts due for goods and services provided to Shelbourne in connection with ongoing operations of the Chicago Spire development.

23. On information and belief, the April 27 Facility Letter listed Kelleher as a borrower in order to permit Anglo Irish to obtain a security interest in Mr. Kelleher's membership in Milltown, LLC and so as not to be subordinate to liens on Shelbourne's Property by making a loan to Shelbourne.

24. No portion of the funds provided pursuant to the April 27 Facility Letter were paid directly to Kelleher or used to pay Kelleher's personal creditors.

25. On or about June 30, 2010, a mechanic's lien creditor of Shelbourne, Lorig Construction Company, commenced a foreclosure action against Shelbourne in the Circuit Court of Cook County, Illinois, initiating litigation captioned *Lorig Construction Company v. Shelbourne North Water Street, LP, et al.*, Case No. 10 CH 27979 (the "Foreclosure Action").

26. On October 1, 2010, Anglo Irish filed a counterclaim in the Foreclosure Action in which Anglo Irish sought foreclosure of the subject property.

The Transfer of the Loan to NALM

27. In 2011, Anglo Irish merged with Irish Nationwide Building Society and became the Irish Bank Resolution Corporation Limited (the "IBRC").

28.  On February 7, 2013, the Irish Minster of Finance ordered the winding-up of the IBRC under the provisions of the Irish Bank Resolution Corporation Act ("IBRC Act"). NALM, formed under Ireland's National Asset Management Agency Act, was established for the purpose of acquiring, holding, and managing loan assets from, among others, the IBRC.

29.  On May 22, 2013, the IBRC transferred and assigned the Loan and Loan Documents to NALM.

30.  Following the assignment of the Loan and Loan Documents to NALM, NALM substituted into the Foreclosure Action and began taking aggressive steps to foreclose upon the Property for alleged defaults under the Loan.

31.  NALM was represented in the Foreclosure Action the law firm of Quarles & Brady LLP and Quarles & Brady partner Leonard Shifflett.

32.  In May, 2013, Kelleher and his proven financier attempted to redeem the Loan and all other loans relating to the Spire Project at "par value." NALM refused to entertain this redemption request or to provide documentation of the loans that NALM was seeking to sell. NALM explained that engaging Kelleher's redemption effort or providing him or his financier documentation regarding the loans being offered for sale would provide an unfair advantage over others considering acquiring the Loan.

33.  NALM subsequently conducted an auction sale of the Loan and Loan Documents. Without good cause to do so, NALM refused to permit Kelleher to participate in the auction for the sale of the Loan and Loan Documents.

34.  By the Loan Purchase and Sale Agreement dated June 13, 2013 (the "Loan Purchase Agreement"), NALM sold the Loan and Loan Documents to RMW Acquisition Company ("RMW"). Kelleher believes that the Loan and Loan Documents were sold for far below par value.

35.  Following the sale of the Loan and Loan Documents to RMW, Shelbourne and Kelleher sought to discover the terms by which the Loan was sold to RMW in the Foreclosure

Litigation. NALM resisted those efforts relying on confidentiality language included in the Loan Purchase Agreement.

36. The court in the Foreclosure Litigation conducted an *in camera* examination of the Loan Purchase Agreement with only counsel for NALM and RMW present, and ordered the transcript of that *ex parte* examination sealed. Counsel for Kelleher and Shelbourne were not permitted to attend that examination and were never permitted to review the sealed transcript.

37. On July 1, 2013, NALM sought to substitute RMW into the Foreclosure Action in place of NALM. The Circuit Court of Cook County refused to grant NALM's request at that time, instead permitting RMW to intervene in the Foreclosure Action.

38. As a result of the denial of its motion to substitute RMW in its place, NALM remained a participant to the Foreclosure Action until December, 2014.

<u>The Chapter 11 Case</u>

39. On October 9, 2013 (the "Petition Date"), RMW, RMW CLP Acquisitions LLC, Thornton Tomasseti, Inc., and Cosentini Associates (the "Petitioners") filed an involuntary petition (the "Involuntary Petition") under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101 *et seq.*, hereinafter the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") against Shelbourne, commencing a bankruptcy case against Shelbourne (the "Bankruptcy Case").

40. On November 8, 2013, as part of an agreed-upon stipulation among Shelbourne and the Petitioners, the Delaware Bankruptcy Court, among other things, entered an order for relief under chapter 11 of the Bankruptcy Code and transferred venue of the Bankruptcy Case to the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court").

41. In late November, 2013, notice of Shelbourne's Bankruptcy Case was served upon Quarles & Brady LLP.

42. On December 27, 2013, RMW filed its Complaint for Declaratory Judgment as to Validity and Priority of Liens and Allowance of Claims (the "Declaratory Judgment Complaint") in the Bankruptcy Case.

43. In support of the Declaratory Judgment Complaint, RMW attached, as an exhibit, a heavily-redacted version of the Loan Purchase Agreement.

44. Because RMW had not obtained authorization from the Court to redact the Loan Purchase Agreement, on February 21, 2014, Shelbourne filed a motion to dismiss the Declaratory Judgment Complaint or, alternatively, for a more definite statement.

45. On February 24, 2014, RMW filed its Motion to File Under Seal and Establish Procedures to Unseal Pursuant to a Protective Order for Purposes of the Bankruptcy Case. (the "Seal Motion") [Docket No. 123]. In the Seal Motion, RMW stated that it "has no objection to the filing, disclosure and use of the unredacted [Loan Purchase Agreement] in this [Bankruptcy] Case subject to an appropriate protective order from this Court as the Court may deem appropriate." Seal Motion, p. 1.

46. On February 26, 2014, NALM's counsel, Sarah K. Baker and Leonard Shifflett of the law firm of Quarles & Brady LLP, filed appearances in the Bankruptcy Case.

47. On February 26, 2014, NALM filed the Application of National Asset Loan Management Ltd. to Set Hearing on Emergency Motion, asking that its request to intervene to be heard on an emergency basis.

48. On February 27, 2014, NALM filed National Asset Loan Management Ltd.'s Emergency Motion to (A) Intervene in Bankruptcy Case for a Limited Purpose, and (B) Shorten Notice (the "Intervention Motion"). In connection therewith, NALM sought to prevent

Shelbourne from obtaining unredacted versions of documents relating to NALM's sale of the Loan to RMW.

49. On February 27, 2014, the Bankruptcy Court conducted a hearing on the Seal Motion and the Intervention Motion. Leonard Shifflett of Quarles & Brady LLP, counsel for NALM, appeared at that hearing and argued for protection from either Shelbourne or Kelleher viewing an unredacted version of the Loan Purchase Agreement.

50. On March 5, 2014, the Bankruptcy Court entered its Order on National Asset Loan Management Ltd.'s Emergency Motion to (A) Intervene in Bankruptcy Case for a Limited Purpose, and (B) Shorten Notice, authorizing NALM to "intervene in the Debtor's bankruptcy case for the limited purposes stated in the Motion."

51. On March 5, 2014, the Bankruptcy Court entered an order granting in part, and denying in part, the Seal Motion [Docket No. 156] (the "Seal Order"). As set forth in the record from the hearing on that date, the Bankruptcy Court ordered portions of the Loan Purchase Agreement to be unredacted and directed that certain of the remaining redactions be removed on an "attorneys' eyes only" basis, with Kelleher unable to view or be informed about those portions of the documents.

52. On March 10, 2014, Shelbourne filed its Chapter 11 Plan of Reorganization (the "Original Plan") [Docket No. 165] and accompanying Disclosure Statement (the "Original Disclosure Statement) [Docket No. 166].

53. On March 11, 2014, Shelbourne and RMW reached a settlement with respect to several issues in dispute between them, including the issues raised in the Declaratory Judgment Complaint.

54. The proposed terms of settlement between Shelbourne and RMW resolved issues arising under the Loan Purchase Agreement, including sections of the Loan Purchase Agreement that had been disclosed on an attorneys' eyes-only basis. As a result, NALM participated in the settlement negotiations through consultation with RMW.

55. Pursuant to the Court's Seal Order, Mr. Kelleher was not permitted to participate personally in the negotiation with respect to the matters that related to designated "attorneys'-eyes-only" portions of the Loan Purchase Agreement.

56. At no time during the settlement negotiations did NALM express its intention to pursue claims against Kelleher relating to the December 29 Facility or the April 27 Facility.

57. On March 26, 2014, the Bankruptcy Court entered an order approving Shelbourne's settlement with RMW.

58. On April 17, 2014, Shelbourne and RMW filed the Amended Joint Chapter 11 Plan of Reorganization of Shelbourne North Water Street, L.P., RMW Acquisition Company, LLC, RMW CLP Acquisitions, LLC and RMW CLP Acquisitions II, LLC [Docket No. 213], implementing the terms of a settlement agreement between Shelbourne and RMW, among others.

59. On June 12, 2014, Shelbourne and RMW jointly filed the Second Amended Joint Chapter 11 Plan of Reorganization of Shelbourne North Water Street, L.P., RMW Acquisition Company LLC, RMW CLP Acquisitions LLC and RMW Acquisitions II LLC (as subsequently modified, the "Plan") and the Amended Disclosure Statement with Respect to the Second Amended Joint Chapter 11 Plan of Reorganization of Shelbourne North Water Street, L.P., RMW Acquisition Company LLC, RMW CLP Acquisitions LLC and RMW Acquisitions II

LLC [Docket No. 246] (as the same may be amended, the "Disclosure Statement"). A copy of the Plan is attached hereto as **Exhibit D**.

60. Throughout the pendency of the Bankruptcy Case, Kelleher was actively involved in Shelbourne's operations and pursuing various reorganization transactions. During this time, Kelleher did not receive any salary for his efforts.

61. In light of Kelleher's undertakings on behalf of Shelbourne, both before and after the Petition Date, and his integral role in Shelbourne's chapter 11 reorganization, Kelleher was included among the "Shelbourne Affiliates" that are "Released Parties" defined in section 1.76 of the Plan.

62. Specifically, section 1.76 of the Plan defines "Released Parties" to mean the Debtor, the Reorganized Debtor, the Shelbourne Affiliates, SPE, GP, Atlas, the Atlas Principal, the Tier One Capital Provider, P+W and RMW and the respective Related Persons of each of the foregoing.

63. Section 1.87 of the Plan defines "Shelbourne Affiliates" to mean "Chicago Spire LLC, Shelbourne Lakeshore, Ltd., Shelbourne Finance Limited and Garrett Kelleher and any of their respective Affiliates other than the Debtor."

64. As one of the "Released Parties" under the Plan, Kelleher is a beneficiary of provisions in sections 7.4 and 7.5 of the Plan that provide releases, discharge and an injunction in favor of both the Debtor and the "Released Parties," including Kelleher.

65. Section 7.4 of the Plan identifies the discharge and releases being provided in favor of Shelbourne and the Released Parties. Specifically, Section 7.4 of the Plan states:

> 7.4 <u>Discharge and Release</u>. Except as specifically provided in this Plan or in the Confirmation Order, effective on the Effective Date, the Released Parties shall be discharged from responsibility, obligation or liability for any and all Claims and Interests of any kind or nature whatsoever, including, but not limited to,

demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtor, (ii) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such Claim has voted on or accepted this Plan. Except as specifically provided in this Plan or Plan Documents to the contrary, the rights provided in this Plan shall be in complete (x) satisfaction, discharge and release of all Claims or demands against, Liens on, and Interests in the Debtor (or Reorganized Debtor), or the assets and properties of the Debtor (or Reorganized Debtor), including the Property, (y) satisfaction, discharge and release of all Claims constituting Released Claims, including, but not limited to, all Causes of Action, whether known or unknown, either directly, indirectly or derivatively through the Debtor or Reorganized Debtor against the Released Parties or on the Property on the same subject matter as any of the Claims, Liens, or Interests described in subpart (x) of this Section 7.4, and (z) satisfaction, discharge and release of all causes of action of the Debtor or Reorganized Debtor, whether known or unknown, including but not limited to all Claims including the Released Claims, against the Released Parties. FURTHER, BUT IN NO WAY LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, ANY ENTITY ACCEPTING ANY DISTRIBUTIONS OR RIGHTS PURSUANT TO THIS PLAN SHALL BE PRESUMED CONCLUSIVELY TO DISCHARGE THE DEBTOR AND REORGANIZED DEBTOR AND HAVE RELEASED THE RELEASED PARTIES FROM (A) THE RELEASED CLAIMS AND (B) ANY OTHER CAUSE OF ACTION BASED ON THE SAME SUBJECT MATTER AS THE CLAIM OR INTEREST ON WHICH THE DISTRIBUTION OR RIGHT IS RECEIVED.

66.     Section 1.75 of the Plan defines "Released Claims" as "any and all Claims, whether at law or equity, against the Released Parties, including, without limitation, Avoidance Actions, the Claims, and all Causes of Action, whether known or unknown, either directly, indirectly or derivatively through the Debtor or Reorganized Debtor on the same subject matter as any of the Claims, Interests, or Liens on the Debtor's Property, but not including claims for gross negligence or willful misconduct in connection with the Chapter 11 Case."

67.     In its capacity as a loan servicer for NALM, operating under the direction of NAMA, Capita has attempted to collect from Kelleher claims totaling not less than

$8,060,999.51 arising from the April 27 Facility and the December 29 Facility (collectively, the "NALM/Capita Claims").

68. The NALM/Capita Claims constitute Released Claims under the Plan.

69. In addition to the releases and discharge provided under Section 7.4 of the Plan, Section 7.5 of the Plan provides an injunction to be imposed upon confirmation of the Plan for the further protection of Shelbourne and the other Released Parties. Specifically, Section 7.5 states:

> Discharge Injunction. Except as specifically provided in the Plan Documents to the contrary, upon entry of the Confirmation Order, this Plan will operate as a permanent injunction prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or demand against or equity Interest in the Released Parties by any Entity, (b) any Claim or demand, whether known or unknown, against the Released Parties by any Entity based on the same subject matter as any Claim, demand or Interest described in Section 7.4, including, without limitation, any guaranties by Released Parties of any such Claims, demands or Interests, or (c) any Claim or demand against, any security interest in or any lien, claim or encumbrance on the Property by any Entity. BY ACCEPTING DISTRIBUTIONS PURSUANT TO THIS PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION. ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.

70. Because the NALM/Capita Claims constitute a "Released Claim" under the Plan, section 7.5 of the Plan, once confirmed and effectuated, enjoins any effort to collect the NALM/Capita Claims against Kelleher.

71. On October 7, 2014, the Bankruptcy Court conducted a hearing on confirmation of the Plan. At the conclusion of that hearing, the Bankruptcy Court entered its Order Confirming the Second Amended Joint Chapter 11 Plan of Reorganization of Shelbourne North Water Street, L.P., RMW Acquisition Company LLC, RMW CLP Acquisitions LLC, and RMW

CLP Acquisitions II LLC, As Modified (the "Confirmation Order"), a copy of which is attached hereto as **Exhibit E**.

72. The Confirmation Order specifically approved the discharges, releases and injunctions provided for in the Plan. Specifically, Paragraph 10 of the Confirmation Order states, in pertinent part:

> a. **Injunctions, Releases and Exculpatory Provisions.** Pursuant to Bankruptcy Rule 3020(c)(1), the following provisions of the Plan are hereby approved, are so ordered, and shall be immediately effective on the Effective Date without further order or action by the Court, any of the parties to such releases, or any other Entity:
>
>> **Section 7.1(b). Each of the Injunctions shall become effective on the Effective Date and shall continue in effect at all times thereafter. Notwithstanding anything to the contrary contained in this Plan, all actions in the nature of those to be enjoined by the Injunctions shall be enjoined during the period between the Confirmation Date and the Effective Date as well.**
>>
>> \* \* \* \*
>>
>> **Section 7.4. <u>Discharge and Release</u>. Except as specifically provided in this Plan or in the Confirmation Order, effective on the Effective Date, the Released Parties shall be discharged from responsibility, obligation or liability for any and all Claims and Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such Claim was filed or deemed filed under section 501 of the Bankruptcy Code, or such Claim was listed on the Schedules of the Debtor, (ii) such Claim is or was Allowed under section 502 of the Bankruptcy Code, or (iii) the Holder of such Claim has voted on or accepted this Plan. Except as specifically provided in this Plan or Plan Documents to the contrary, the rights provided in this Plan shall be in complete (x) satisfaction, discharge and release of all Claims or demands against, Liens on, and Interests in the Debtor (or Reorganized Debtor), or the assets and properties of the Debtor (or Reorganized Debtor), including the Property, (y) satisfaction, discharge and release of all Claims constituting Released Claims, including, but not limited to, all Causes of Action, whether known or unknown, either**

**directly, indirectly or derivatively through the Debtor or Reorganized Debtor against the Released Parties or on the Property on the same subject matter as any of the Claims, Liens, or Interests described in subpart (x) of this Section 7.4, and (z) satisfaction, discharge and release of all causes of action of the Debtor or Reorganized Debtor, whether known or unknown, including but not limited to all Claims including the Released Claims, against the Released Parties. FURTHER, BUT IN NO WAY LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN, ANY ENTITY ACCEPTING ANY DISTRIBUTIONS OR RIGHTS PURSUANT TO THIS PLAN SHALL BE PRESUMED CONCLUSIVELY TO DISCHARGE THE DEBTOR AND REORGANIZED DEBTOR AND HAVE RELEASED THE RELEASED PARTIES FROM (A) THE RELEASED CLAIMS AND (B) ANY OTHER CAUSE OF ACTION BASED ON THE SAME SUBJECT MATTER AS THE CLAIM OR INTEREST ON WHICH THE DISTRIBUTION OR RIGHT IS RECEIVED.**

**Section 7.5. <u>Discharge Injunction</u>. Except as specifically provided in the Plan Documents to the contrary, upon entry of the Confirmation Order, this Plan will operate as a permanent injunction prohibiting and enjoining the commencement or continuation of any action, the employment of process or any act to collect, recover from, or offset (a) any Claim or demand against or equity Interest in the Released Parties by any Entity, (b) any Claim or demand, whether known or unknown, against the Released Parties by any Entity based on the same subject matter as any Claim, demand or Interest described in Section 7.4, including, without limitation, any guaranties by Released Parties of any such Claims, demands or Interests, or (c) any Claim or demand against, any security interest in or any lien, claim or encumbrance on the Property by any Entity. BY ACCEPTING DISTRIBUTIONS PURSUANT TO THIS PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR INTEREST WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THIS INJUNCTION. ALL INJUNCTIONS OR STAYS PROVIDED FOR IN THE CHAPTER 11 CASE UNDER SECTION 105 OR 362 OF THE BANKRUPTCY CODE, OR OTHERWISE, AND IN EXISTENCE ON THE CONFIRMATION DATE, SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE.**

73. Both the Plan and Confirmation Order were served upon counsel for NALM.

74. NALM did not object to confirmation of the Plan.

75. On November 3, 2014, the Effective Date of the Plan occurred and the Plan was effectuated by Shelbourne.

76. Based on the entry of the Confirmation Order and the effectuation of the Plan, Kelleher became entitled to the benefits and protections of sections 7.4 and 7.5 of the Plan as one of the "Released Parties."

77. Notwithstanding the entry of the Confirmation Order, Capita has improperly continued its attempts to collect the NALM/Capita Claims from Kelleher.

78. In late 2014, Kelleher spoke with one of Capita's senior employees about the NALM/Capita Claims. That employee confirmed that the loans relating to the December 29 Facility and the April 27 Facility that are the basis for the NALM/Capita Claims were business loans for the purpose of the development of the Spire and not personal loans to Kelleher.

79. During 2014, Capita sent loan statements relating to the April 27 Facility and the December 29 Facility to Kelleher at an address in Dublin, Ireland at which he no longer resided. In late 2014, Mr. Kelleher informed Capita that it was sending these loan statements to an incorrect address, after which Capita demanded proof of (i) a lease relating to property in Chicago, (ii) a bank statement, and (iii) a photo identification card before it would change the address to which it sent the statements.

80. Despite Capita's acknowledgements and the fact that the NALM/Capita Claims were released and discharged, and their collection enjoined by the Plan and Confirmation Order, beginning in January, 2015, and each quarter thereafter, Capita has sent a loan statement to Kelleher at his residence seeking payment relating to the April 27 Facility.

81. Despite Capita's acknowledgements and the fact that the NALM/Capita Claims were released and discharged, and their collection enjoined by the Plan and Confirmation Order, beginning in January, 2015, and each quarter thereafter, Capita has sent a loan statement to Kelleher at his residence seeking payment relating to the December 29 Facility.

### **COUNT I: DECLARATORY JUDGMENT (Against All Defendants)**

82. Kelleher hereby incorporates and restates the allegations of Paragraphs 1 through 81 above as if fully set forth herein.

83. Notwithstanding the entry of the Confirmation Order, Capita, on behalf of NALM, has willfully continued to try to collect payment from Kelleher of the NALM/Capita Claims.

84. Kelleher is a "Released Person" under the Plan and Confirmation Order.

85. The NALM/Capita Claims are released and enjoined pursuant to the Plan and Confirmation Order.

86. Despite the entry of the Confirmation Order, Capita and NALM have willfully and improperly continued to try to collect the NALM/Capita Claims against Kelleher.

87. Declaratory relief by this Court will terminate some or all of the existing controversy between the parties. The controversy is of sufficient immediacy to justify the issuance of a declaratory judgment.

88. Kelleher is therefore entitled to a declaration that: (a) all claims against Kelleher relating to the April 27 Facility and the December 29 Facility, including but not limited to the NALM/Capita Claims, are released and discharged pursuant to the Plan and Confirmation Order; and (b) all collection of claims against Kelleher relating to the April 27 Facility and December 29 Facility, including but not limited to the NALM/Capita Claims, is enjoined pursuant to the Plan and Confirmation Order.

WHEREFORE, Garrett Kelleher respectfully requests that this Court enter a declaratory judgment in his favor and against Capita and NALM finding that all claims against Kelleher have been released, discharged and any collection has been enjoined, and awarding costs of suit, and granting such other and further relief as is just.

### COUNT II:  CLAIM FOR ACTUAL AND PUNITIVE DAMAGES RELATING TO VIOLATION OF THE RELEASES, DISCHARGE AND INJUNCTIONS IMPOSED BY THE CONFIRMATION ORDER (Against All Defendants)

89. Kelleher hereby incorporates and restates the allegations of Paragraphs 1 through 88 above as if fully set forth herein.

90. At all times relevant herein, Capita has been aware that the NALM/Capita Claims relate to business loans for the benefit of Shelbourne, having been used to pay Shelbourne's vendors directly for work performed on the Spire project.

91. Pursuant to the Plan and Confirmation Order, the NALM/Capita Claims are among the "Released Claims" that are released and for which collection is enjoined against Kelleher.

92. NALM's counsel received timely notice of the entry of the Confirmation Order, which specifically approved and identified the releases and injunctions set forth in the Plan.

93. Despite the fact that NALM's counsel received actual notice of the entry of the Confirmation Order, Capita, on behalf of NALM, has willfully and improperly continued to try to collect payment from Kelleher on the NALM/Capita Claims.

94. Capita's actions, on behalf of NALM, constitute a willful violation of the releases, discharge and injunction implemented by the Confirmation Order.

95. Kelleher has incurred costs as a result of Capita and NALM's violation of the injunctions set forth in the Plan, including but not limited to, the costs relating to the preparation of this Complaint.

96. Kelleher is also entitled to punitive damages as a result of Capita and NALM's willful violation of the releases, discharge and injunction implemented by the Confirmation Order.

WHEREFORE, Garrett Kelleher respectfully requests that this Court enter judgment in his favor and against the Capita and NALM, awarding actual damages and punitive damages in an amount to be determined, and granting such other and further relief as is just.

Dated:  July 29, 2015               Respectfully submitted,

                                    GARRETT KELLEHER

                                By:   */s/ Joseph D. Frank*
                                        One of his attorneys

Joseph D. Frank (IL Bar No. 6216085)
Jeremy C. Kleinman (IL Bar No. 6270080)
FRANKGECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois  60654
Telephone:     (312) 276-1400
Facsimile:     (312) 276-0035
jfrank@fgllp.com
jkleinman@fgllp.com